Charles C. Weller (SBN: 207034)
legal@cweller.com
CHARLES C. WELLER, APC
11412 Corley Court
San Diego, California 92126
Tel: 858.414.7465
Fax: 858.300.5137

Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JILL CALANGIAN and NATALIE GIANNE, *individually and on behalf of all those similarly situated*, | )<br>)<br>)<br>) No. _____ |
| *Plaintiff*, | ) |
| | ) **CLASS ACTION COMPLAINT** |
| *v.* | ) |
| | ) JURY TRIAL DEMANDED |
| NESTLÉ USA, INC. dba San Pellegrino, *a Delaware corporation*, | )<br>) |
| *Defendant*. | )<br>) |

Jill Calangian and Natalie Gianne ("Plaintiffs"), individually and on behalf of all others similarly situated in the state of California, by and through undersigned counsel, hereby bring this action against Nestlé USA, Inc. dba San Pellegrino ("San Pellegrino" or "Defendant"), alleging that its Sparkling Fruit Beverages ("the Products"), which are manufactured, packaged, labeled, advertised, distributed, and sold by Defendant, are misbranded and falsely advertised because Defendant implies that they are healthy and conducive to health and physical well-being, despite containing between 17 and 26 grams of added sugar per serving, and upon information and belief and investigation of counsel alleges as follows:

**PARTIES**

1.      Plaintiff Jill Calangian is and at all times relevant was a citizen of the state of California, domiciled in Dale City, California.

2.      Plaintiff Natalie Gianne is and at all times relevant was a citizen of the state of California, domiciled in Los Angeles, California.

3.      Calangian purchased the Aranciata Rossa flavor of the Products on or about December 4, 2024 at a Trader Joe's Market in San Francisco. She purchased the Limonata flavor of the Products on or about Dember 8, 2024 at a Trader Joe's Market in San Francisco. She believes and on that basis avers that she has purchased the Products at other times during the putative Class period.

4.      Gianne purchased the purchased the Limonata flavor of the Products from eBay on or about March 12, 2025. She believes and on that basis avers that she has purchased the Products at other times during the putative Class period.

5.      Defendant Nestlé USA, Inc. dba San Pellegrino is a Delaware corporation with its principal place of business in Arlington, Virginia. On information and belief, it is the American subsidiary of Nestlé S.A., a Switzerland corporation.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, Pub. L. 109-2, 119 Stat. 4 (codified in scattered sections of Title 28 of the United States Code); specifically, under 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal district courts over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and [that] is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A).

7.      Plaintiffs seek to represent Class members who are citizens of states different from the Defendant.

8.    The matter in controversy in this case exceeds $5,000,000 in the aggregate, exclusive of interests and costs.

9.    In addition, "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

10.    In the alternative, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000, exclusive of interest and costs.

11.    This Court has personal jurisdiction over Defendant because this action arises out of and relates to Defendant's contacts with this forum.

12.    Those contacts include but are not limited to sales of the Products directly to commercial and individual consumers located in this district, including Plaintiffs; shipping the Products to commercial and individual consumers in this district, including Plaintiffs; knowingly directing advertising and marketing materials concerning the Products into this district through wires and mails, both directly and through electronic and print publications that are directed to commercial and individual consumers in this district; and operating an e-commerce web site that offers the Products for sale to commercial and individual consumers in this district, as well as offering the Products for sale through third-party e-commerce websites, through both of which commercial and individual consumers residing in this district have purchased the Products.

13.    Defendant knowingly directs electronic activity and ships the Products into this district with the intent to engage in business interactions for profit, and it has in fact engaged in such interactions, including the sale of the Products to Plaintiffs.

14.    Defendant also sells the Products to retailers and wholesalers in this district for the purpose of making the Products available for purchase by individual consumers in this district.

15.    Plaintiffs' losses and those of other Class members were sustained in this district.

16.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district.

17.    Venue is also proper pursuant to 28 U.S.C. § 1391(c)(2) because this Court maintains personal jurisdiction over Defendant.

## FACTUAL ALLEGATIONS

**A.    The Prevalence and Dangers of Overconsumption of Sugar.**

18.    Prior to the mid-20th century, Americans mostly consumed sugar in the form of table sugars (sucrose) used as a condiment, as well as small amounts of glucose ingested from dairy products and fructose from fruit, berries, and other sources such as honey.

19.    Since the 1960s, new food technologies have permitted the development of inexpensive, highly concentrated sugars that are available to be used in mass-produced processed foods—especially high-fructose corn syrup ("HFCS"), an inexpensive, shelf-stable sweetener derived from corn that is far sweeter than fructose naturally found in relatively small amounts in berries and fruits.

20.    The development of HFCS caused an explosion in Americans' consumption of fructose, which increased more than 100-fold from 1970 to 2000.[1]

21.    Today, while many Americans are aware of and attempt to avoid added sugar in their foods in the form of high-fructose corn syrup, they are less aware that equally unhealthy added sugar (hiding under dozens of descriptions and chemical names) is found in more than three-quarters of processed foods consumed by Americans. That includes both sweet foods such as desserts and sweetened beverages, but also many savory foods including pasta sauces, soups, and breads.

22.    In 2017-2018, the average daily intake of added sugars was 17 teaspoons for children and young adults aged 2 to 19 years, and the same amount for adults aged 20 or older, significantly higher than the intake recommendations set forth by the American Heart

---

[1] George Bray, et al., "Consumption of high-fructose corn syrup in beverages may play a role in the epidemic of obesity." 79 AM. J. CLIN. NUTR. 537, 540 (2004), *available at* https://pubmed.ncbi.nlm.nih.gov/15051594/.

Association. Added sugar intake tends to be highest among minorities, those who are poor, and those with lower education levels.[2]

23.     Today, "the vast majority of the U.S. population"—about 90 percent—"exceeds recommended intakes of . . . added sugars."[3]

24.     This explosion in the availability and consumption of added sugars and foods has precipitated a health crisis in the United States.

25.     Because of limits on the liver's capacity to process sugars, increases in sugar consumption beyond that processing threshold causes sugar to act a liver toxin. That threshold is somewhere between 12 and 38 grams, depending on age and sex.[4]

---

[2] Seung Hee Lee, et al., "High Added Sugars Intake among US Adults: Characteristics, Eating Occasions, and Top Sources, 2015–2018." 15 NUTRIENTS 265 (2023), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC9867287/.

[3] U.S. Dep't of Agric. & U.S. Dep't of Health & Human Servs., "Scientific Report of the 2015 Dietary Guidelines Advisory Committee: Advisory Report to the Secretary of Health and Human Services and the Secretary of Agriculture," at 26, 35 (February 2015), *available at* http://www.health.gov/dietaryguidelines/2015-scientific-report/PDFs/Scientific-Report-ofthe-2015-Dietary-Guidelines-Advisory-Committee.pdf.

[4] Rachel Johnson, et al., "Dietary Sugars Intake and Cardiovascular Health: A Scientific Statement From the American Heart Association." 120 CIRCULATION 1011, 1016-17 (2009), *available at* https://pubmed.ncbi.nlm.nih.gov/19704096/.

26.     Overconsumption of sugar has been linked to a cluster of chronic diseases and conditions including overweight and obesity,[5] cardiovascular disease,[6] type 2 diabetes,[7] high blood pressure,[8] various cancers,[9] and chronic inflammation.[10]

27.     Overconsumption of sugar has been shown to prompt craving and withdrawal symptoms similar to those prompted by alcohol and cocaine.[11]

**B.    Health Agencies Recommend Curbing Total Sugar Intake**

28.     Given the evident health effects of sugar overconsumption, relevant health bodies and government agencies have recommended limiting sugar consumption to a person's minimal percentage of ingested total calories, usually less than 10 percent.

---

[5] Samir Faruque, et al., "The Dose Makes the Poison: Sugar and Obesity in the United States – a Review." 69 POL. J. FOOD. NUTR. SCI. 219 (2020), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC6959843/; Emily J. Endy, et al., "Added sugar intake is associated with weight gain and risk of developing obesity over 30 years: The CARDIA study." 34 NUTR. METAB. CARDIOVASC. DIS. 466 (2023), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC11253751/.

[6] Quanhe Yang, "Added sugar intake and cardiovascular diseases mortality among US adults." 174 J. AM. MED. ASSN. INTERN. MED. 516 (2014), *available at* https://pubmed.ncbi.nlm.nih.gov/24493081/.

[7] Yan Liu, et al., "Associations between Total and Added Sugar Intake and Diabetes among Chinese Adults: The Role of Body Mass Index." 15 NUTRIENTS 3274 (2023), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC10384374/.

[8] Lisa A Te Morenga, et al., "Dietary sugars and cardiometabolic risk: systematic review and meta-analyses of randomized controlled trials of the effects on blood pressure and lipids." 100 AM. J. CLIN. NUTR. 65 (2014), *available at* https://pubmed.ncbi.nlm.nih.gov/24808490/.

[9] J. Aranceta Bartrina, et al., "Association between sucrose intake and cancer: a review of the evidence." 28 NUTRICIÓN HOSPITALARIA 95-105 (2013); C. Garcia-Jimenez, "A new link between diabetes and cancer: enhanced WNT/beta-catenin signaling by high glucose." 52 J. of MOLECULAR ENDROCRINOLOGY (2014); Linden, G.J., "Allcause mortality and periodontitis in 60-70-year-old men: a prospective cohort study." 39 J. CLIN. PERIODONTAL 940-46 (October 2012).

[10] Xiao Ma, et al., "Excessive intake of sugar: An accomplice of inflammation." 13 FRONTIERS IN IMMUNOL. 988481 (2022), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9471313/.

[11] Volkow, N.D., et al., "Drug addiction: the neurobiology of behavior gone awry." 5 NATURE REVIEWS NEUROSCIENCE 963 (2004); Brownell, K.D., et al., FOOD AND ADDICTION: A COMPREHENSIVE HANDBOOK (Oxford Univ. Press 2012).

29.    The American Heart Association recommends restricting added sugar to 5 percent of calories, which means about 12 grams for younger children, up to 25 grams for adult women and 38 grams for adult men.[12]

30.    Likewise, health officials in the United Kingdom recommend "intake of free sugars should not exceed 5% of total dietary energy for age groups from 2 years upwards."[13]

31.    The World Health Organization recommends that no more than 10 percent of an adult's calories—and ideally less than 5 percent—should come from added sugar or from natural sugars in honey, syrups, and fruit juice.[14]

32.    The Food and Drug Administration (FDA) has adopted the United States Department of Agriculture's daily recommended value (DRV) of 50 grams of added sugar, or 10 percent of calories based on a 2,000-calorie diet. *See* 81 Fed. Reg. 33,742, 33,820 (May 27, 2016).

33.    While the FDA acknowledged the AHA and WHO recommendations to keep added sugars below 5% of calories, it set the daily recommended value at 50 grams or 10 percent of total calories because this level was "more realistic considering current consumption of added sugars in the United States as well as added sugars in the food supply." *Id.* at 33,849.

34.    While the rule did note that "some added sugars can be included as part of a healthy dietary pattern," FDA also emphasized that "the DRV for added sugars should not be viewed as a recommended amount for consumption," and "[w]e also have scientific evidence to support limiting calories from added sugars to less than 10 percent of calories." *Id.* at 33,829, 33,840.

---

[12] Johnson, *supra* n. 4.

[13] "Sugar Recommendations Department of Health, England," (Oct. 2015), *available at* https://ec.europa.eu/health/sites/health/files/nutrition_physical_activity/docs/ev_20151028_co07_en.pdf.

[14] *See* World Health Organization, "Sugars intake for adult and children: Guideline" (Mar. 4, 2014), *available at* http://www.who.int/nutrition/publications/guidelines/sugars_intake/en (based on scientific evidence, recommending adults and children reduce daily intake of free sugars to less than 10% of total energy intake and noting that "[a] further reduction to below 5% or roughly 25 grams (6 teaspoons) per say would provide additional health benefits").

35.    FDA's recommendation was based, in part, on the 2015 Dietary Guidelines Advisory Committee's "food pattern analysis," which the agency stated "demonstrate[d] that when added sugars in foods and beverages exceeds 3% to 9% of total calories … a healthful food pattern may be difficult to achieve."[15]

**C.    San Pellegrino Sparkling Fruit Beverages Contain Huge Amounts of Sugar By Any Relevant Measure.**

36.    San Pellegrino formulates, manufactures, distributes, and sells a line of sparkling fruit drinks under its own brand name.

37.    These Products are widely distributed throughout the state of California through the San Pellegrino website, online retailers such as Amazon.com, and through brick-and-mortar retailers such as Trader Joe's, Costco, Walmart, Target, and Sprouts.

38.    A serving of each drink is one can containing 330 ml or 11.5 fluid ounces. Each serving contains between 17 and 26 grams of added sugar, with all but one flavor of the Products containing between 22 and 26 grams of added sugar.

39.    In each flavor of the Products, added sugar is the second-most used ingredient by volume, after water, and before any fruit concentrate, fruit extract, or flavoring, as shown in the ingredients list of the Products:

---

[15] U.S. Department of Agriculture, "Scientific Report of the 2015 Dietary Guidelines Advisory Committee" (February 2015), Ch. 6 p.26.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



40.    By way of context, 38 grams is the point at which sugar becomes a liver toxin, and is the outer limit of the American Heart Association's recommendation for daily consumption of added sugars for a normal adult male. The recommended level of consumption for adult women is 25 grams, the same as for children aged 8-18 years. A single serving of these drinks thus contains more than 2/3rds of the recommended daily consumption of added sugars

for adult men, and about the entirety of the daily recommended consumption for adult women and most children and teens.

41.    A single serving of the Products comprises between 34 and 52 percent of the much higher recommended daily value for sugars set by the FDA—which was only set at that level because lower levels, though preferable from a health standpoint, were considered unrealistic "considering current consumption of added sugars in the United States as well as added sugars in the food supply." 81 Fed. Reg. at 33,849.

42.    The amount of total calories, total sugar, added sugar, and percent of recommended daily value of sugar from added sugar for a 330 ml serving of each flavor of the high-sugar San Pellegrino Sparkling Fruit Beverages is set forth in the table below:

| PRODUCT | TOTAL CALORIES | TOTAL SUGARS | ADDED SUGARS | % DRV ADDED SUGARS |
|---|---|---|---|---|
| Limonata Sparkling Beverage | 110 | 26 g | 25 g | 50% |
| Aranciata Sparkling Beverage | 120 | 27 g | 22 g | 44% |
| Aranciata Rossa Sparkling Beverage | 130 | 29 g | 25 g | 50% |
| Melograno & Arancia Sparkling Beverage | 120 | 29 g | 23 g | 46% |
| Pompelmo Sparkling Beverage | 130 | 30 g | 26 g | 52% |
| Ciliegia & Limone Sparkling Beverage | 90 | 18 g | 17 g | 34% |

**D.    San Pellegrino Implies That the Products Are Healthy Despite Containing Huge Amounts of Added Sugar.**

43.    To sell these Products, San Pellegrino employs a marketing strategy designed to give consumers the erroneous impression that they are healthy or are conducive to good health and physical activity and well-being.

44.    For example, San Pellegrino prominently makes the claim on the Products' label and on the individual cans that the Products are "Made With Natural Origin Italian Lemons" and other fruits, and reinforces the claim with depictions of ripe fruits and leaves:

1

2

3

4

5

6

7

8

9

10

11

12



13    45.    At times throughout the relevant Class period, the Products have also been sold to

14 consumers (including Plaintiff Gianne) branding them as "Naturali," an Italian word meaning

15 "Natural," and claiming that they are made with 100% natural ingredients:

16

17

18

19

20

21

22

23

24

25

26

27

28



46.     These claims, along with the repeated description of the Products on the label as "natural" convey that the Products are healthy or are conducive to good health and physical activity and well-being, which is misleading because that representation is incompatible with the dangers of excessive sugar consumption to which the Products contribute.

47.     That consumers conflate claims of "naturalness" with an assertion that a food is healthy is well established in relevant academic literature on consumer behavior. One survey of more than 4,000 European consumers, for example, found that more than three-quarters of respondents perceived a close connection between claims that a food was "natural" and claims that it was "healthy,"[16] even though from "a natural science perspective, naturalness certainly does not mean that a food is less risky, healthier, or tastier."[17]

48.     In fact, numerous academic studies and surveys of consumers have noted that "food naturalness … is frequently linked to healthiness, freshness, and organic or locally produced foods" in consumers' perception.[18]

49.     Online marketing for the Products extends and confirms the health claims made by San Pellegrino regarding the Products.

---

[16] Kampffmeyer Food Innovation Study (2012), *at* http://goodmillsinnovation.com/sites/kfi.kampffmeyer.faktor3server.de/files/attachments/1_pi_kfi_cleanlabelstudy__english_final.pdf.

[17] Sergio Roman, Michael Siegrist, and Luis Manuel Sanchez-Siles, *The importance of food naturalness for consumers: Results of a systematic review*, 67 TRENDS IN FOOD SCI. & TECH. 44, 44 (Sept. 2017), *at* https://www.sciencedirect.com/science/article/pii/S092422441730122X?via%3Dihub.

[18] *See, e.g.*, *id*. at 45 (citing research).

50.    On Amazon.com, San Pellegrino describes the Products as being "Made With Real Mediterranean Fruit Juice" and with "No Artificial Flavors or Sweeteners," while repeating other claims made on the label concerning the "Natural Origin" of the Products:

 

51.    Likewise, the San Pellegrino website repeatedly touts the Products' "natural origins" and "authentic ingredients." *See* https://www.sanpellegrino.com/us/beverages/fruit.

52.    All of these claims convey that the Products, because they are natural, are healthy or are conducive to good health and physical activity and well-being. This deliberately conveyed impression is misleading and deceptive because that message is incompatible with the dangers of excessive sugar consumption to which the Products contribute.

53.    In total, the combination of text, graphical elements, and pictures on the Products' packaging and marketing materials is designed to give reasonable consumers the overall impression that the Products are healthy and conducive to physical activity and good health when they are not.

54.    This finding is consistent with academic literature that concludes that consumers tend to "satisfice" when reviewing food labels, rather than scrutinizing them carefully. That is, pressed for time and confronted by numerous options, they tend to review disclosures on labels quickly to assimilate pertinent information and make a "good-enough" decision, rather than analyzing specific details or any claim or attribute (including whether a food that is "natural"

actually is healthier than other products) in depth. *See* Lauren E. Willis, *Decisionmaking and the Limits of Disclosure: The Problem of Predatory Lending: Price*, 65 MD. L. REV. 707, 742, 767-69 (2006).

55.    Consumers are even more likely to take these shortcuts for low-dollar purchases—such as the Products—where consumers perceive the stakes to be low. Decision-making about such products "involves a simpler process of choice where heuristics are more easily applied." Tilde Heding, *et al.*, BRAND MANAGEMENT: RESEARCH, THEORY AND PRACTICE 93 (2d ed. 2016).

56.    In designing labels, marketers understand consumers' tendency to "satisfice" and respond accordingly. Given the number of products in an average supermarket (about 50,000), marketers are aware that they have "about one-tenth of a second to make an impression on the shopper." Allan J. Kimmel, PSYCHOLOGICAL FOUNDATIONS OF MARKETING 90-91 (2d ed. 2018).

57.    Here, Defendant painstakingly and intentionally designed its Products' labels to deceive consumers into believing that the Products are healthy or are conducive to good health and physical activity and well-being, especially by repeated emphasis on the "naturalness" of the Products, which conveys to reasonable consumers that the Products are healthy.

58.    Cementing this impression in reasonable consumers' minds is the fact that these Products are carbonated waters, which consumers generally believe to be healthier than other beverage options such as sodas. This impression is cemented by the overall consumer impression of the San Pellegrino, which was built on unflavored or lightly flavored no-calorie carbonated spring waters.

59.    The Products are sold for similar prices and make similar misrepresentations regardless of flavor. Plaintiff is therefore an adequate representative of a putative class despite not having purchased every flavor of the Products.

**E.    Plaintiff Relied On Defendant's Labeling and Marketing Statements**

60.    Consumers have been conditioned to rely on the accuracy of the claims made on food products' labels, as these are a central means by which manufacturers convey information to consumers.

61.    Consumers including Plaintiffs especially rely on label and marketing claims made by food product manufacturers such as Defendant, as they cannot confirm or disprove those claims simply by viewing or even consuming the Products.

62.    Plaintiffs reviewed the label on the Products and the other statements regarding the characteristics of the Products that are described herein. Consumers such as Plaintiffs who viewed the Products' labels and associated marketing statements reasonably understood the statements to mean that the Products are healthy or conducive to good health and physical well-being. These statements are false and/or misleading, as the Products contain sugar in amounts per serving that far exceed an amount that is healthy or conducive to good health or physical activity and well-being.

63.    Consumers including Plaintiffs reasonably relied on these statements described herein such that they would not have purchased the Products from Defendant if the truth about the Products was known, or would have only been willing to pay a substantially reduced price for the Products had they known that Defendant's representations were false and misleading.

64.    In the alternative, because of its deceptive and false labelling statements, Defendant was enabled to charge a premium for the Products relative to key competitors' products, or relative to the average price charged in the marketplace.

65.    That information was material to reasonable consumers, especially the class of consumers who are the target market of the Products. The absence of this information also allowed Defendant to charge a price premium to consumers including Plaintiffs.

66.    Instead of receiving products that had actual healthful qualities, the Products that Plaintiffs and the Class received were not healthy. Instead, consumption of these Products causes

increased risk of obesity, diabetes, hypertension, cancer, and other morbidities, as set forth herein.

67.    Plaintiffs suffered economic injury by Defendant's fraudulent and deceptive conduct as stated herein, and there is a causal nexus between Defendant's deceptive conduct and Plaintiffs' injuries.

## CLASS ACTION ALLEGATIONS

68.    Plaintiffs bring this action individually and as representatives of all those similarly situated pursuant to Federal Rule of Civil Procedure 23 on behalf of all consumers in the state of California who purchased the Products within four years prior to the filing of this Complaint.

69.    Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

70.    Plaintiffs reserve the right to alter the Class definition, and to amend this Complaint to add additional Subclasses, as necessary to the full extent permitted by applicable law.

71.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as individual Class members would use to prove those elements in individual actions alleging the same claims.

72.    **Numerosity – Rule 23(a)(1)**: The size of the Class is so large that joinder of all Class members is impracticable. Plaintiffs believe and aver there are thousands of Class members geographically dispersed throughout the state of California.

73.    **Existence and Predominance of Common Questions of Law and Fact – Rule 23(a)(2), (b)(3)**: There are questions of law and fact common to the Class. These questions predominate over any questions that affect only individual Class members. Common legal and factual questions and issues include but are not limited to:

a.    Whether the marketing, advertising, packaging, labeling, and other promotional materials for Defendant's Products is misleading and deceptive;

b.    Whether a reasonable consumer would understand Defendant's statements as described herein to indicate that the Products are healthy and conducive to health and physical activity and well-being, and reasonably relied upon those representations;

c.    Whether Defendant was unjustly enriched at the expense of the Plaintiffs and Class members;

d.    Whether Defendant breached an express warranty;

e.    the proper amount of damages;

f.    the proper scope of injunctive relief; and

g.    the proper amount of attorneys' fees.

74.    Defendant engaged in a common course of conduct in contravention of the laws Plaintiffs seek to enforce individually and on behalf of the Class. Similar or identical violations of law, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate this action. The common questions will yield common answers that will substantially advance the resolution of the case.

75.    In short, these common questions of fact and law predominate over questions that affect only individual Class members.

76.    **Typicality – Rule 23(a)(3)**: Plaintiffs' claims are typical of the claims of the Class members because they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

77.    Specifically, all Class members, including Plaintiffs, were harmed in the same way due to Defendant's uniform misconduct described herein; all Class members suffered similar economic injury due to Defendant's misrepresentations; and Plaintiffs seek the same relief as the Class members.

78.    There are no defenses available to Defendant that are unique to the named Plaintiffs.

79.    **Adequacy of Representation – Rule 23(a)(4)**: Plaintiffs are fair and adequate representatives of the Class because Plaintiffs' interests do not conflict with the Class members' interests. Plaintiffs will prosecute this action vigorously and are highly motivated to seek redress against Defendant.

80.    Furthermore, Plaintiffs have selected competent counsel who are experienced in class action and other complex litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the resources to do so.

81.    **Superiority – Rule 23(b)(3)**: The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy for at least the following reasons:

a.    the damages individual Class members suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct such that it would be virtually impossible for the Class members individually to redress the wrongs done to them. In fact, they would have little incentive to do so given the amount of damage each member has suffered when weighed against the costs and burdens of litigation;

b.    the class procedure presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and supervision by a single Court;

c.    the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendant; and

d.    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would be dispositive of the interests

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

of other Class members or would substantively impair or impede their ability to protect their interests.

82.    Unless the Class is certified, Defendant will retain monies received as a result of its unlawful and deceptive conduct alleged herein.

83.    Unless a class-wide injunction is issued, Defendant will likely continue to advertise, market, promote, and sell its Products in an unlawful and misleading manner, as described throughout this Complaint, and members of the Class will continue to be misled, harmed, and denied their rights under the law. Defendant continues to mislabel the Products in the manner described herein and sell them to the consuming public. Plaintiffs would like to purchase the Products and other products sold by Defendant in the future when they can do so with the assurance that the Products' labels are truthful and consistent with the Products' actual ingredients. But they cannot currently do so because they cannot rely on the Products' labelling, given the deceptions regarding the healthfulness of the Products that are found there. An injunction prohibiting future deceptive labelling is therefore warranted and would provide Plaintiffs and the Class relief.

84.    Furthermore, Plaintiffs have not merely alleged an "informational" injury, but has also alleged that Defendant has been enabled to charge a price premium for the Products. Plaintiffs have therefore alleged that accurate, non-deceptive labeling the Products would cause a decrease in the price of the Products at which Plaintiffs and members of the Class would be willing to buy the Products. As a result, Plaintiffs have alleged more than simply an interest in Defendant telling the truth on its labels, but an economic injury that further supports prospective injunctive relief.

85.    Injunctive relief, in the form of affirmative disclosures on the front label regarding the added sugar content of the Products, is necessary to dispel the public misperception about the Products that has resulted from years of Defendant's unfair, fraudulent, and unlawful marketing efforts. Such affirmative front label disclosures are common in the food industry and in fact have been recommended by the Consumer Brands Association ("CBA"), a national food

products manufacturers' trade association. The CBA's "Facts Up Front" program created front-label icons that quickly and transparently disclose on the front label of a food product the amount of nutrients of concern in a standard serving size of a food, including added sugars. These front-label icons are now used on thousands of food items, including beverages that compete directly with the Products:



See https://consumerbrandsassociation.org/facts-up-front/.

86.     **Ascertainability**. To the extent ascertainability is required, the Class members are readily ascertainable from Defendant's records and/or its agents' records of retail and online sales, as well as through public notice.

87.     Defendant has acted on grounds applicable to the Class as a whole, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

# COUNT 1
## VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT,
## CAL. CIV. CODE § 1750 *et seq*.

88.     Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

89.     Plaintiffs are "consumers" within the meaning of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1761(d).

90.     The sale of Defendant's Products to Plaintiffs and Class members was a "transaction" within the meaning of the CLRA, Cal. Civ. Code § 1761(e).

91.     The Products purchased by Plaintiffs and Class members are "goods" within the meaning of the CLRA, Cal. Civ. Code § 1761(a).

92.     As alleged herein, Defendant's business practices are a violation of the CLRA because Defendant deceptively failed to reveal facts that are material to representations that were made by Defendant on the Products and on its website.

93.     Defendant's ongoing failure to provide material facts about its Products on its labels violates the following subsections of Cal. Civ. Code § 1770(a) in these respects:

    a.  Defendant's acts and practices constitute misrepresentations that its Products have characteristics, benefits, or uses which they do not have;

    b.  Defendant misrepresented that its Products are of a particular standard, quality, and/or grade, when they are of another;

    c.  Defendant's acts and practices constitute the advertisement of goods, without the intent to sell them as advertised;

    d.  Defendant's acts and practices fail to represent that transactions involving its Products involve actions that are prohibited by law, particularly the use of misleading nutritional labelling; and

    e.  Defendant's acts and practices constitute representations that its Products have been supplied in accordance with previous representations when they were not.

94.     By reason of the foregoing, Plaintiffs and the Class have been irreparably harmed, entitling them to injunctive relief.

95.     Concurrent with the filing of this Complaint, Plaintiffs will give written notice pursuant to Cal. Civ. Code § 1782 of the particular violations of the CLRA described herein and demand that Defendant rectify the actions described above by providing complete monetary relief, agreeing to be bound by its legal obligations and to give notice to all affected customers of its intent to do so.

96.     Pursuant to Cal. Civ. Code §§ 1770 and 1780, Plaintiffs are entitled to enjoin publication of misleading and deceptive nutritional labels on Defendant's Products and to recover reasonable attorneys' fees and costs.

**COUNT 2**
**UNJUST ENRICHMENT**

97.     Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative in the event that Plaintiffs have an inadequate remedy at law.

98.     Under California law, a claim for unjust enrichment "describe[s] the theory underlying a claim that a defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion, or request.'" *Astiana v. Hain Celestial Grp., Inc.* 783 F.3d 753, 762 (9th Cir. 2015) (quoting 55 *Cal. Jur.* 3d *Restitution* § 2). Thus, when a plaintiff alleges unjust enrichment, the Court should "construe the cause of action as a quasi-contract claim seeking restitution." *Rutherford Holdings, LLC v. Plaza Del Rey,* 223 Cal.App.4th 221, 225 (2014). Courts in California have allowed unjust enrichment and CLRA claims to proceed in the alternative. *See, e.g., Scheibe v. Livwell Prods., LLC,* No. 23-cv-216, 2023 WL 4414580, at *8 (S.D. Cal. 2023).

99.     Defendant, through its marketing and labeling of the Products, misrepresented and deceived consumers by misrepresenting that the Products are healthy and conducive to health and physical well-being, despite containing between 17 and 26 grams of added sugar per serving.

100.    Defendant did so for the purpose of enriching itself and it in fact enriched itself by doing so.

101.    Consumers conferred a benefit on Defendant by purchasing the Products, including an effective premium above their true value. Defendant appreciated, accepted, and retained the benefit to the detriment of consumers.

102.    Defendant continues to possess monies paid by consumers to which Defendant is not entitled.

103.    Under the circumstances it would be inequitable for Defendant to retain the benefit conferred upon it and Defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience.

104.    Plaintiffs seek disgorgement of Defendant's ill-gotten gains and restitution of Defendant's wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

105.    Plaintiffs have standing to pursue this claim as Plaintiffs have suffered injury in fact as a result of Defendant's actions as set forth above.

**COUNT 3**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**CAL. CIV. CODE § 2314 *et seq.***

106.    Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

107.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, through the acts set forth herein, made representations to Plaintiffs and the Class regarding the health and nutrition properties of the Products.

108.    Defendant is a merchant with respect to the goods of this kind which were sold to Plaintiffs and the Class, and there was, in the sale to Plaintiffs and other consumers, an implied warranty that those goods were merchantable.

109.    The Products do not conform to the implied warranty that the Products are healthy and conducive to health and physical well-being, because they contain between 17 and 26 grams of added sugar per serving and increase the risk of obesity, diabetes, cardiovascular disease, and other morbidities as described herein.

110.    As a direct and proximate cause of Defendant's breach of implied warranty, Plaintiffs and Class members have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew instead of being healthy and conducive to health and physical well-being, the Products contain between 17 and 26 grams of added sugar per serving; (b) they paid a price premium based on Defendant's implied warranties; and (c) the Products do not conform to the promises or affirmations of fact made on the container or label.

CLASS ACTION COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court grant the following relief against Defendant:

a.  Certifying the Class;

b.  Declaring that Defendant violated the CLRA and/or was unjustly enriched and/or breached an express warranty;

c.  Ordering an awarding of injunctive relief as permitted by law, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

d.  Ordering Defendant to pay reasonable attorneys' fees and litigation costs to Plaintiffs; and

e.  Such other relief as the Court may deem just and proper.

TRIAL BY JURY IS DEMANDED ON ANY COUNTS SO TRIABLE.


Respectfully submitted,


/s/ *Charles C. Weller*
Charles C. Weller (Cal. SBN: 207034)
Attorney for Plaintiffs

May 8, 2025